IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 16, 2018

## OSCAR ARMANDO DELGADO v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Marion County**
No. 10237, 9610-A  Thomas W. Graham, Judge

_____

### No. M2017-01231-CCA-R3-PC

_____

The Petitioner, Oscar Armando Delgado, appeals the denial of his petition for post-conviction relief, arguing that trial counsel was ineffective for not fully advising him of the immigration consequences of his plea or providing him with a Spanish language interpreter, thereby rendering his guilty plea unknowing and involuntary.  Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Russell S. Mainord, Altamont, Tennessee, for the appellant, Oscar Armando Delgado.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Sherry Shelton, District Attorney General; and David O. McGovern, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

In October 2013, the Marion County Grand Jury indicted the Petitioner and Christina L. McLendon together for first degree premeditated murder based on the June 22, 2013 killing of Jeffrey A. Mora, and the Petitioner alone for tampering with evidence based on the Petitioner's having concealed a machete used in the crime.  The State subsequently filed a notice of its intent to seek life imprisonment without the possibility of parole, citing the aggravating circumstance that the murder was especially heinous,

atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. On August 28, 2014, Ms. McLendon entered a best interest guilty plea to solicitation to commit first degree murder, a Class B felony, and was sentenced as a Range I offender to eight years in the Department of Correction. Pursuant to her negotiated plea, she agreed to testify truthfully in the case against the Petitioner.

On September 14, 2015, the Petitioner pled guilty to the lesser offense of second degree murder in exchange for a sentence of twenty-five years at 100% in the Department of Correction, with credit given for the approximately three years he had spent in jail. The tampering with evidence charge was dismissed.

At the guilty plea hearing, the prosecutor gave a fairly lengthy recitation of the facts on which the State would have relied had the case gone to trial. He stated that the Petitioner and Ms. McLendon had been in a relationship and had lived together off-and-on at the Alpine Lodge in Hamilton County. At the time of the murder, Ms. McLendon had moved out and was living temporarily in her vehicle. On June 21, 2013, Ms. McLendon loaned her vehicle to the victim, who was a friend and had helped her move out of the Alpine Lodge. When the victim failed to return with her vehicle at the end of her work day, Ms. McLendon became angry, searched unsuccessfully for the vehicle and the victim with the assistance of friends, and ultimately ended up back at the Alpine Lodge with the Petitioner. The Petitioner was smoking methamphetamine that night and, as he and Ms. McLendon discussed the victim's failure to return the vehicle, they both became increasingly angry.

The next day, Ms. McLendon and the Petitioner were walking together towards Chattanooga when they encountered the victim in Ms. McLendon's vehicle. The Petitioner got into the back seat of the vehicle while Ms. McLendon drove and the victim rode in the front passenger seat. Initially, it was the Petitioner and Ms. McLendon who "were exchanging words," while things seemed to be "okay" between the Petitioner and the victim. In fact, at some point during the drive the Petitioner gave the victim a methamphetamine rock, which the victim "ate." However, at a later point during the drive, the Petitioner reached up to the front seat and grabbed the victim's neck while holding a knife. Ms. McLendon slammed on the brakes and exited the vehicle as the Petitioner cut the victim's neck, back, and "several different parts of his body" with the knife. The victim got out of the vehicle and moved to the side of the road while the Petitioner retrieved a machete, followed, and began striking the victim with the machete, severing his thumb and cutting him across the face, on the back of his head, and "across his body in numerous places." The Petitioner then got into the driver's seat of the vehicle and backed into the victim, knocking him partially through a fence and perhaps running over him.

The Prosecutor stated that the State's proof would include the testimony of a man who was driving down the highway and witnessed the vehicle backing into the bloodied victim and Ms. McLendon getting into the vehicle, as well as the testimony of a woman who came upon the scene after the Petitioner and Ms. McLendon had left, saw the severely injured victim, and called 911. He stated the State's proof would show that the Petitioner and Ms. McLendon's next movements consisted of: returning to the Alpine Lodge, where they attempted to wash the blood off the vehicle with "mud puddle water"; going next to a friend's, where they made some attempt to change clothes and wash up; going next to the Petitioner's place of employment, where the Petitioner told a co-worker, from whom he retrieved some money, that he had killed someone; and traveling over the next day or so to various other places in Hamilton County where the Petitioner and Ms. McLendon saw "different people," got in the water, swam, and changed clothes.

The Prosecutor stated that the State's proof would also be that the Petitioner and Ms. McLendon then began traveling south toward Georgia, stopping at a Walmart where they purchased hair dye that Ms. McLendon used to color her hair. He stated that the Petitioner and Ms. McLendon ultimately ended up in Valdosta, where they made contact with some of Ms. McLendon's relatives, who, in turn, contacted the police. The two were apprehended by law enforcement and Ms. McLendon gave a statement consistent with the facts that the prosecutor had just set out. For his part, the Petitioner gave a statement to law enforcement in which he "acknowledged . . . there had been a death, there was a lot of blood, that there was some sort of knife involved, and that he told some people subsequently that he had killed the victim[.]" According to the prosecutor's recitation of facts, the Petitioner indicated in his statement that he had "blacked out" during the killing itself.

On October 1, 2015, the Petitioner filed a motion to withdraw his guilty plea, alleging that his decision to plead guilty "was based almost exclusively on expected testimony by witnesses called by the State as to statements made to law enforcement investigations and others" but that "[t]he statements were made at a time when [the Petitioner] was in a state of intoxication, thus rendering his statements involuntary and untrustworthy." The trial court overruled the motion on December 18, 2015.

On March 2, 2016, the Petitioner filed a pro se petition for post-conviction relief in which he raised a number of claims, including ineffective assistance of counsel and unknowing and involuntary guilty plea. Following the appointment of post-conviction counsel, he filed an amended petition on January 24, 2017, in which he alleged that trial counsel was defective, leading to the entry of an unknowing and involuntary guilty plea, because counsel did not fully inform him of the immigration consequences of the plea or ensure that he was provided with a Spanish language interpreter in order to understand the proceedings.

- 3 -

At the May 11, 2017 evidentiary hearing, the thirty-seven-year-old Petitioner, through an interpreter, testified that he came to the United States from El Salvador at the age of twenty or twenty-one. Prior to coming to the United States, he completed high school and attended community college to train as a chef. He never took any English classes and did not speak, read, or write any English when he came to this country. After his arrival, he learned to speak English "on the streets with [his] buddies"; he never took English as a Second Language or any other similar classes.

The Petitioner acknowledged that he had served as an interpreter for friends who did not speak any English and had once or twice helped interpret for law enforcement officers. He said, however, that his interpretation involved only basic information such as color, food, age, and how far along a woman was in her pregnancy. He had never interpreted anyone's legal rights and had never interpreted in a court proceeding. Prior to the instant case, he had been arrested only one time, for speeding and violation of the seat belt law, which he had handled by paying a fine rather than going to court.

The Petitioner testified that no one in trial counsel's office spoke Spanish and trial counsel never had anyone explain the plea deal to him in Spanish. He said he could not remember trial counsel's having explained his various rights to him and that if counsel did, he did not understand him. He stated that trial counsel never discussed with him the impact that his guilty plea would have on his immigration status. The Petitioner testified that before he was arrested in the instant case, he had "TPS" status, which meant that he could live and work in this country. After his arrest, he was unable to renew that status because he was incarcerated. However, he believed that as soon as he was released, he could "go back" and explain that he had been incarcerated and could "get it right back."

The Petitioner further testified that he was unable to read English at the time he entered his guilty plea and could not read the guilty plea agreement. Although trial counsel read the agreement to him in English and explained some things, he was nervous and did not understand it. He testified that he told the trial judge at the guilty plea hearing that he understood the proceedings because trial counsel instructed him to do so. According to the Petitioner, during the plea colloquy trial counsel either nodded his head yes or shook his head no to indicate to the Petitioner how to answer the judge's questions. The Petitioner testified that he did not understand all his rights at the time he entered his plea.

On cross-examination, the Petitioner acknowledged that he told the officers who took his statement in Georgia that he understood English "98 percent," but said that he was "high on drugs" at the time he made that false claim. He agreed that trial counsel had his statements transcribed and that he read them to the Petitioner. He said trial counsel told him if he did not accept the plea agreement he would receive life

- 4 -

imprisonment. He stated that he thought it was in his best interest at that time, but he now believed that he would not have received life imprisonment if he had been found guilty at trial because he had never before been in trouble.

The Petitioner remembered that one of the detectives who interviewed him told him that he was being charged with first degree murder but could not recall having been informed that it was premeditated murder. He claimed he did not know the meaning of premeditation and said that he did not remember questioning the detective about how he could be charged with premediated murder when he "never even planned to do that[.]"

The Petitioner acknowledged having pled guilty to four different charges of driving on a revoked license in Hamilton County. In an apparent attempt to explain the inconsistency between those convictions and his direct examination testimony about never having before been in trouble, he stressed that he never had to go to jail for any of them. He said that an interpreter was provided for him when he went to court to pay the fines associated with those offenses.

The Petitioner testified that he had no memory of having called the police to an address in Red Bank on April 19, 2005, to make a complaint about "[a] television, and an argument, and cutting the cable[,]" and denied that he was charged with assault in connection with the call. After having his memory refreshed by the interpreter reading him a portion of the affidavit of complaint, he recalled the incident but said he never went to court and the case was dismissed after 11 months, 29 days "because it was just an argument." He denied that he spoke to the officer who responded to the call in English, claiming instead that the responding officer was Cuban and spoke to him in Spanish. He said the responding officers were men and he knew nothing about Officer Melissa Varner, who signed the affidavit of complaint. He also claimed that the case had caused no problems with his immigration status and expressed ignorance as to why "INS hold" was noted on the file.

The Petitioner denied that a conviction involving violence would affect his TPS status, testifying that it was only convictions for "terrorism, gangs and drugs." He also denied that convictions for multiple misdemeanors would affect TPS status, stating that it was possible to apply to have misdemeanor records expunged every two to three years. Although his testimony on this point was not clear, the Petitioner indicated that he had twice either applied for expunction or had his records expunged.

The Petitioner initially denied any memory of a DUI arrest on March 7, 2013, in Rossville, Georgia, or that he provided the arresting officer with a fake California ID card. After having his memory prompted with more details, the Petitioner testified that he was charged with driving without a license and having a light out and that the officers

had his blood drawn because officers in that area "always take a blood sample . . . [b]ecause they want to try to put more charges on you." He said he did not remember that his blood alcohol level was .142. He stated that he would be surprised that the officer included on the arrest warrant that he spoke fluent English.

The Petitioner testified that he did not remember having been charged with driving offenses in Gwinnett County, Georgia, in 2002 or having received a violation of probation in connection with the case.

The Petitioner acknowledged that he was aware that his arrest and/or conviction in the instant case would affect his immigration status and would likely result in deportation:

> Q. And, [Petitioner], when you were arrested here, you were notified that immigration had placed a detainer on you?
>
> A. Well, they didn't tell me it was Officer Wingo when I was back here. He called another officer and that officer said that since I did not renew my TPS then it's very likely that I was going to get deported.
>
> Q. So you knew there were issues about being deported?
>
> A. If they found me guilty maybe.
>
> Q. Okay. So pleading guilty would have an effect on his [sic] status?[1]
>
> A. Maybe it could have.
>
> Q. And you already knew that there were issues before you pled guilty?

---

[1] The prosecutor appears to have directed this question to the interpreter, with the "his" referring to the Petitioner's immigration status. Shortly after the above exchange, the interpreter interrupted to "request that people speak directly to each other" in order to avoid confusion.

A.  Yes, because I was in here for more than a year, and I did not renew my permit.

The Petitioner testified that he knew he was receiving a twenty-five-year sentence as part of his plea but did not understand that the sentence would be served at 100 percent.  He said he was aware of some individuals who had received twenty-five-year sentences but only served five years and that everyone told him that his sentence was "too much for what [he] had done."  He stated that he accepted the plea deal because trial counsel "put fear in [him]" and made him nervous that he would receive life imprisonment if he went to trial.

Trial counsel testified that he never used an interpreter when talking to the Petitioner because he believed that he and the Petitioner were able to clearly communicate with each other.  Although there may have been times when he had to reword something in order to complete the communication, he always felt that they "were communicating adequately."  He stated that the State's ultimate offer "came down very late in the game," which made the Petitioner's decision "more rushed" than trial counsel would have liked.  He said he and co-counsel discussed the offer with the Petitioner and the likelihood of success at trial and both strongly recommended that the Petitioner accept the offer.  As he recalled, the Petitioner was somewhat reluctant to accept it, but he and co-counsel convinced him that "the trial was going to be very much an uphill battle[.]"  Trial counsel believed the Petitioner understood the plea agreement and his rights at the time he entered the plea, but trial counsel also recognized that sometimes a person can think he understands something when he does not.

On cross-examination, trial counsel testified that he had been practicing law since the 1980s and had represented dozens of clients who had been charged with some type of homicide.  He agreed that he routinely reviews "every minute detail of a guilty plea" with a client and said that he was sure he did the same in the Petitioner's case.  Although he did not have a specific memory of it, he believed that he probably paraphrased to the Petitioner paragraph 11 of the plea agreement, which was that his guilty plea conviction would create a problem with his immigration status and that he could be deported.  Trial counsel said he had known about Padilla v. Kentucky, 599 U.S. 356 (2010), since it came out and was confident that he informed the Petitioner about the immigration consequences of his plea.

Trial counsel recalled discussing the sentence in detail with the Petitioner and what it meant in terms of his expected release date.  He was adamant that he never told the Petitioner that he would be eligible for parole after service of thirty percent of the

sentence or that he might have to serve only five years. He said he never thought the Petitioner needed an interpreter and could not recall the Petitioner's ever having asked for one. In his review of the Petitioner's statements to law enforcement, he never saw anything to indicate that the Petitioner did not understand the officers. There was also nothing to indicate that the Petitioner did not understand the guilty plea proceedings. Trial counsel testified that, although the Petitioner was more reluctant than he would have liked with respect to his acceptance of the plea offer, it was ultimately the Petitioner's decision alone.

Officer Jonathan Wingo, a corrections officer with the Marion County Sheriff's Department, testified for the State that he had frequent interactions with the Petitioner during the time the Petitioner was housed at the Marion County Jail, which was from July 2, 2013 until shortly after his September 14, 2015 guilty plea. During that time, he and the Petitioner communicated in English without the Petitioner expressing any lack of understanding of the language. He said the Petitioner assisted in interpreting for Spanish-speaking inmates and, unassisted, wrote a number of jail grievances and medical requests in English. On cross-examination, Officer Wingo testified that he never spoke with the Petitioner about legal issues.

On May 19, 2017, the post-conviction court entered an order denying the petition for post-conviction relief, concluding that the Petitioner received effective assistance of counsel and entered a knowing and voluntary guilty plea. Among other things, the court found, based on the testimony of the witnesses and the court's own observations of the Petitioner during the guilty plea colloquy, that "no Constitutional deficiency c[ould] be attributed to the Petitioner's English language skills." The court further found that the Petitioner signed the written plea agreement that contained the required notice of possible deportation and that he received adequate notice of possible deportation.

## ANALYSIS

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of

correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly

given before it can be accepted. 395 U.S. at 242. Similarly, our Tennessee Supreme Court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he or she fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

In his interrelated claims, the Petitioner argues that trial counsel was deficient for failing to provide an interpreter and fully advise him of the immigration consequences of his plea, thereby rendering his guilty plea unknowing and involuntary. In denying relief on the basis of these claims, the post-conviction court found that the Petitioner was fluent enough in English to understand the proceedings without an interpreter and that he received adequate notice of his possible deportation as a result of his guilty plea. The court, therefore, concluded that the Petitioner received effective assistance of counsel and entered a knowing and voluntary plea.

The record fully supports the findings and conclusions of the post-conviction court. The transcripts of the Petitioner's statements to police reveal that the interviews were conducted entirely in English, a language in which the Petitioner claimed 98% proficiency. The sheriff's deputy testified that he communicated entirely in English with the Petitioner, that the Petitioner interpreted for fellow inmates who could not speak English, and that the Petitioner wrote jail grievances in English. The Petitioner himself acknowledged that he had served as an interpreter for the police and for his friends.

In addition, trial counsel testified that he saw no need for an interpreter because he and the Petitioner were able to adequately communicate with each other. He also saw no indication that the Petitioner was having difficulty understanding English during his interviews with police or that he did not understand the plea agreement or the guilty plea proceedings.

- 10 -

The transcript of the guilty plea hearing reveals that the trial court informed the Petitioner of his constitutional rights and of the specific rights he was waiving by pleading guilty. The Petitioner assured the trial court that his counsel had explained the plea agreement to him, that he fully understood the constitutional rights he was waiving by entering his pleas, and that he was freely and voluntarily entering the plea. At the beginning of the plea colloquy, the trial court specifically asked the Petitioner if he felt comfortable proceeding with "the amount of language command" he had of the English language. The Petitioner answered that he did, and trial counsel, when asked, expressed his belief that the Petitioner was able to understand the proceedings. Notably, the Petitioner objected to several of the details of the proof the State intended to present had the case proceeded to trial, indicating a clear ability to understand the Prosecutor's recitation of the facts.

Although the trial court did not specifically inquire of the Petitioner as to whether he had been informed by his counsel of the possible immigration consequences of his plea, see Tenn. R. Crim. App. 11(b)(1)(J), the Petitioner signed the guilty plea agreement, which clearly states that upon a guilty plea to a criminal offense, a non-citizen defendant's immigration or naturalization status may be affected and may subject the defendant to deportation from the United States. Trial counsel testified that he was certain that he informed the Petitioner of the immigration consequences of his plea, and the Petitioner acknowledged during his evidentiary hearing testimony that he was aware at the time of his arrest or shortly after that there would be problems with his immigration status and that he would possibly face deportation if convicted of the offense. Moreover, despite the Petitioner's claim on direct examination that his only prior criminal activity was a minor traffic offense, there was evidence that he had a fairly significant history of arrests and convictions, evidencing his familiarity with the criminal justice system.

## CONCLUSION

Based on our review, we conclude that the petitioner has not met his burden of showing that trial counsel was ineffective or that his guilty plea was unknowing and involuntary. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

- 11 -